# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

DOMINIQUE DEWAYNE
GULLEY-FERNANDEZ,
        Plaintiff,

    v.                              Case No. 15-C-795

DR. TRACY JOHNSON,
DAVID GARDNER,
WARDEN GARY BOUGHTON,
CHRISTA K. MORRISON,
DR. SHIRLEY DAWSON, and
DR. DAWN LANDERS,
        Defendants.

---

## DECISION AND ORDER

The *pro se* plaintiff, Dominique DeWayne Gulley-Fernandez, is incarcerated at the Wisconsin Secure Program Facility. Plaintiff alleges that defendants violated her[1] rights under the Eighth Amendment to the United States Constitution and state law because they have not properly treated her gender identity disorder and continue to house her at an institution that is harmful to her condition. The parties have filed cross-motions for summary judgment. In addition, plaintiff has filed a motion for diagnostic evaluation, a motion to appoint counsel, a motion for injunctive relief, and a motion for a John Doe criminal investigation. Because the undisputed facts establish that plaintiff does not have gender identity disorder and that defendants did not act with deliberate

---

[1] Plaintiff is a biological male and has never been diagnosed as transgender. However, out of respect for plaintiff's stated preference for the feminine pronoun, I will use feminine pronouns in this decision.

indifference to her condition, I will grant defendants' motion for summary judgment, deny plaintiff's summary judgment motion, and dismiss this case.

## PROCEDURAL BACKGROUND

On March 21, 2016, the court consolidated this case with *Gulley-Fernandez v. Johnson*, Case Number 15-cv-995-RTR (E.D. Wis.). (ECF No. 56.) Plaintiff filed her comprehensive amended complaint on March 31, 2016. (ECF No. 62.) She alleged that defendants have failed to treat her gender identity disorder and mental health issues, and that defendants have continued to house her near inmates who sexually harass and abuse her. I subsequently screened plaintiff's comprehensive amended complaint and allowed her proceed on these claims under the Eighth Amendment. (ECF No. 71.)

On May 4, 2017, I consolidated Case No. 17-cv-1347-LA with this case. (ECF No. 154.) In that case, which was transferred from the Western District of Wisconsin, plaintiff alleged that defendants Tracy Johnson, David Gardner, T. Sebranek, and Dr. Burton Cox, Jr., were failing to properly treat plaintiff's gender dysphoria in violation of the Eighth Amendment and state law.

I subsequently granted plaintiff's request to dismiss defendants Dr. Torria Van Buren, Dr. Gary Ankarlo, Dr. Kevin Kallas, Dr. Victoria (Tori) Sebranek, Dr. Burton Cox, Timothy Haines, and Troy Hermans. (ECF No. 170.) That leaves only the following individuals as defendants: Shirley Dawson, Dawn Landers, Tracy Johnson, Christa Morrison, David Gardner, and Gary Boughton.

## MOTIONS FOR SUMMARY JUDGMENT

**A.    Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## B. Factual Background[2]

---

[2] This section is taken from the Defendants' Proposed Findings of Fact. (ECF No. 168.) Plaintiff did not respond to defendants' proposed facts and she did not file her own proposed facts. Thus, defendants' proposed findings of fact are undisputed. *See* Fed. R. Civ. P. 56(e); Civil L.R. 56(b)(4) (E.D. Wis.).

Plaintiff is an inmate in the custody of the Wisconsin Department of Corrections. She was transferred from Dodge Correctional Institution to the Wisconsin Secure Program Facility (WSPF) on March 10, 2011, where she is currently housed. Defendant Dawson was a psychiatrist at Dodge Correctional Institution while plaintiff was housed there in 2010-2011. Defendant Landers was a licensed psychologist at Dodge Correctional Institution. Defendant Johnson is the psychologist supervisor at WSPF. Defendant Morrison is an offender classification specialist with the Bureau of Offender Classification and Movement. Defendant Gardner is an administrative captain at WSPF. Defendant Boughton is the warden at WSPF. Morrison and Gardner serve as members of the Program Review Committee at WSPF.

Plaintiff has been allowed to proceed on her claims that defendants failed to adequately treat her gender identity disorder and mental health issues at WSPF. She is proceeding on Eighth Amendment deliberate indifference claims against all defendants. She also proceeds on state-law claims for medical malpractice and negligence against Johnson based on allegations that Johnson ignored her requests for treatment or transfer. (*See* Case No. 17-cv-347-LA, ECF No. 18 at 8.) Plaintiff's claims can be properly divided into two groups: (1) claims against health and psychological care staff members (Dawson, Landers and Johnson) that resulted in her placement at WSPF and (2) claims against other staff (Morrison, Gardner, and Boughton) who allegedly unconstitutionally retain her at WSPF.

1. <u>Plaintiff's History within the Wisconsin Department of Corrections</u>

Plaintiff claims that she, as a transgender inmate, is inappropriately and unconstitutionally housed at WSPF. She believes that the defendants have violated her

4

constitutional rights by failing to house her around inmates who are more tolerant of her condition. Plaintiff claims that, at WSPF, she is housed around inmates that call her names. She believes that WSPF does not have appropriate psychological or health care staff to treat inmates with gender identity disorders. Plaintiff admits that she has never been diagnosed with a gender identity disorder, that a gender identity disorder diagnosis is a matter of medical judgment, and that none of the named defendants have ever said anything negative to her regarding her stated gender identity.

In October 2015, plaintiff underwent a gender identity consultation with the department's independent consultant, Cynthia Osborne. Osborne did not diagnose plaintiff with a gender identity disorder.

Most recently, and in the context of this lawsuit, plaintiff was evaluated by Dr. Chester Schmidt, a Johns Hopkins psychiatrist who specializes in the diagnosis, treatment and care of patients with gender identity disorders. Dr. Schmidt met with plaintiff on July 13, 2017. Plaintiff claims that she was honest during her conversation with Dr. Schmidt, and that the two discussed plaintiff's family, history, alleged symptoms of gender identity disorder, and physical symptoms that she believes are related to her disorder. Plaintiff shared with Dr. Schmidt that she would like to undergo psychotherapy, hormonal treatment, and eventually have a sex change operation.

Dr. Schmidt's October 2, 2017, report noted that plaintiff "has a many year interest in living in a cross-gender role." (Rakvic-Farr Ex. 1007 at 1.) He noted that plaintiff, although street-wise about everyday activities, makes poor decisions when it comes to her relationship with authority and societal and prison rules. Dr. Schmidt diagnosed plaintiff with mild intellectual disability and antisocial personality disorder.

Based upon the lack of independent medical records that confirm plaintiff's assertions regarding her history of taking cross-sex hormones and upon her unreliable historical reports and attempts at deception, Dr. Schmidt concluded that plaintiff is not eligible for management with cross-gender hormones. He found that plaintiff did not meet three of the four criteria that psychiatrists analyze before prescribing hormone therapy.[3] Dr. Schmidt noted that plaintiff has failed to demonstrate the ability to conform her behaviors to social norms even in the highly-structured prison environment and that plaintiff has taken no responsibility for her repeated disruptive behaviors.

Plaintiff's ongoing psychological concerns prevented Dr. Schmidt from making a diagnosis of gender dysphoria. Dr. Schmidt opened that f plaintiff is diagnosed with gender dysphoria in the future, a clinical decision regarding whether plaintiff is eligible for cross-gender hormones should be made at that time. According to Dr. Schmidt, once plaintiff's disciplinary and medical records "document stabilization of function," plaintiff should be evaluated once again. Until then, she should continue to be provided counseling therapy.

### 2. Plaintiff's Alleged Gender Identity Disorder

Plaintiff describes her sexual orientation as "bisexual slash transgender," but admits that her sexual orientation has evolved over time. Plaintiff was not treated for gender identity issues prior to her incarceration in 2010, though she took hormones that she purchased off the street and used intermittently for some time in her early teens.

---

[3] The criteria for hormone therapy are as follows: (1) persistent, well-documented gender dysphoria (criterion not met); (2) capacity to make a fully informed decision and to consent to treatment (criterion not met); (3) age of majority in a given country (criterion met); and (4) if significant medical or mental health concerns are present, they must be reasonably well controlled (criterion not met). (Rakvic-Farr Ex. 1007 at 3-4.)

Plaintiff first had feelings that she wanted to transition from male to female when she was eight years old. She cross-dressed a handful of times as a child, and dressed as a woman daily in high school. Plaintiff has taken steps to feminize herself within prison, including using socks and clothing to fill out her chest.

At her deposition, plaintiff explained that she would like to live "fully" as a woman for "a day, two days, a week, a month, a year. Go from there, do the hormonal therapy treatment, the psychotherapy, and then the whole – undergoing the whole SRS." (Rakvic-Farr Ex. 1006, Gulley Dep. 123:23-124:2.) Plaintiff has a mandatory release date in 2021 (with no possibility of parole before then) and agrees that it will be easier for her to pursue these options once she is released. Until then, she does not believe that WSPF is appropriate for her.

Plaintiff claims that she has been subjected to batteries by other inmates at WSPF. In June 2016, she was punched during recreation, but she did not need medical attention. In April 2017, plaintiff was punched after she "messed with" another inmate in the library "to piss him off." (Rakvic-Farr Ex. 1006, Gulley Dep. 30:18-35:5.)

Plaintiff has about fifteen inmate friends at WSPF. She has participated in WSPF's mentoring program for troubled inmates. According to plaintiff, the mentoring program is for "[i]nmates that have – that had difficulties growing up, that have difficulty coping with the environment of the prison system, inmates who happen to be they [sic] first adult incarceration, who happen to be getting into a lot of trouble, getting conduct reports here and there for frivolous things, being loud on the range, being disruptive – excuse me – you know, things of that nature." (Rakvic-Farr Ex. 1006, Gulley Dep. 59:1-12.) Plaintiff states that she came up with the mentoring program idea, and defendant

Gardner was responsive. Plaintiff participated in the mentoring program "for a while" before she got to doing "my own thing again", "going back downhill, not – not listening to the mentors, not taking they [sic] advice, got into some trouble that I take responsibility for, stole things here, stole things there, got a conduct report for it, ended up going to Seg[.]" (Rakvic-Farr Ex. 1006, Gulley Dep. 60:14-25.)

Plaintiff admits that she has been attention seeking for as long as she can remember and specifically does things to get a negative reaction from those around her. She has an extensive conduct history that she does not dispute. Plaintiff has moved cells within WSPF on average every other week and admits that she is disruptive on every unit where she is housed. She has had to be moved to other units a total of 59 times and has been moved to different ranges or cells within the same unit a total of 60 times since she has been at WSPF because of rule violations, disruptive conduct, and disrespectful remarks towards other inmates. She has also been moved due to other inmates' disruptive behavior towards plaintiff, after plaintiff has provoked them. Just days prior to her September 22, 2017 deposition, plaintiff received a conduct report for being loud and disruptive on her housing unit. According to plaintiff, she just "snapped." Plaintiff has received conduct reports for sexual conduct and making disrespectful, sexual comments. Plaintiff agrees that it is reasonable for prison staff to expect her to control her behavior before they move her to another prison.

Plaintiff has told "almost the entire institution" that she is transgender. (Rakvic-Farr Ex. 1006, Gulley Dep. 14:11-15.) Some inmates are tolerant of her sexual preferences, and plaintiff has requested to be housed by twenty-three other inmates

who she considers tolerant. She gave a list of inmates to Gardner and requested to be housed by them, though she understands that she does not get to select her housing.

Housing decisions at WSPF are made after considering a number of factors, including (1) assessment and evaluation of an inmate's needs or program assignments such as vocational, educational, and assigned work duties; (2) the inmate's status, such as general population, disciplinary separation, or administrative confinement; (3) security considerations, if applicable, including prior reports from other institutions or restrictions already in place regarding the inmate's suitability for certain types of housing assignments; and (4) bed space availability. While inmates would prefer to be housed near their friends, that is not always possible and is not a consideration used by security staff when placing inmates within the institution.

When plaintiff arrived at WSPF in March 2011, she was placed in the Restrictive Housing Unit in disciplinary separation status because she had recently been given 120 days of disciplinary separation for rule violations while at Dodge Correctional Institution. Since plaintiff has been at WSPF, she received 71 major conduct reports and 51 minor conduct reports for rule violations.

Plaintiff believes that there are certain things that may help her fare better in prison. For example, she believes that if she had a TV in her cell she would not have problems with the other inmates and would do a better job of keeping to herself. Although plaintiff was initially given a "loaner" TV at WSPF, she lost it after she received a conduct report. She admits that it was her own fault that she lost the TV, and admits that she continues to have problems in prison: "It's – it's hard. I have extreme poor distress tolerance. So any time I get distressed – I don't tolerate BS. So any time I see –

9

see – see BS happening to me, I snap out. I threaten to harm myself, which I have done in the past. Placed on clinical observation, get – banging my head, trying to bite my wrists open, cutting myself, getting strapped down, et cetera." (Rakvic-Farr Ex. 1006, Gulley Dep. 66:25-68:25.)

Plaintiff claims that the psychological care provided at WSPF is constitutionally deficient. She claims that she would have "put up a fight" against her transfer to WSPF if she knew that it was the "supermax" prison. Plaintiff admits that she has no idea how WSPF compares to other maximum security prisons in Wisconsin, but believes that more movement is allowed at other prisons. Plaintiff believes that WSPF is a "supermax…for inmates who have a severe traumatic volatile background, volatile history, inmates who have a problem with other inmates who can't get along with other inmates, batteries, all that type of stuff." (Rakvic-Farr Ex. 1006, Gulley Dep. 171:17-23.) Plaintiff does not believe that she belongs at WSPF. But she admits to the behavior that led to many of her conduct reports at WSPF, some of which were due to disruptive behavior.

According to the defendants, WSPF is not a "supermax" prison. Rather, WSPF is the same as other maximum security prisons in Wisconsin such as Columbia Correctional Institution and Waupun Correctional Institution. Inmates are not sent to WSPF as punishment. WSPF is a smaller prison and the smaller inmate population allows for most inmates to be housed in single cells and allows for a smaller inmate-to-staff ratio. The sole basis for plaintiff's belief that she is not receiving appropriate psychological care is that Waupun Correctional Institution has more staff members in its

Psychological Services Unit. But WSPF's inmate population of 468 is significantly smaller than Waupun's 1,251 inmates.

Plaintiff admits that she continues to work through significant mental health care issues and that her current mental health concerns are not under control.

3.   Dr. Dawson

Plaintiff was under Dr. Dawson's care from 2010 through 2011, when she was initially housed at Dodge. Plaintiff claims that Dawson removed certain diagnoses that allowed her to be transferred to WSPF rather than another maximum security prison. She also claims that Dawson "lied" and said that plaintiff wanted to go to WSPF.

Dr. Dawson treated plaintiff five times from December 2, 2010 through February 28, 2011. She treated plaintiff for sleep issues, anxiety, and depression. Dr. Dawson diagnosed plaintiff with bipolar affective disorder due to her positive response to mood stabilizing medication that she had prescribed. Plaintiff told Dr. Dawson that she wanted to go to WSPF because she would have her own cell and could receive certain programming. Dr. Dawson agreed to reconsider the bipolar diagnosis (which may prevent a transfer to WSPF) if plaintiff's mood and behavior were stable without medication. A few weeks later, plaintiff's mood was stable and Dr. Dawson removed the bipolar diagnosis.

Dr. Dawson had no input regarding plaintiff's transfer to WSPF. Nor was Dr. Dawson consulted with respect to the "Mental Health Screen" that was completed by a psychologist prior to plaintiff's transfer to WSPF. Dr. Dawson's limited role was to review the "Mental Health Screen" completed by the psychologist and Health Services Manager, and to summarize plaintiff's current reported symptoms and severity.

4. <u>Dawn Landers</u>

Plaintiff's claim against Landers is that she evaluated plaintiff at Dodge "for this whole placement of WSPF" and promised her programs at WSPF including "loaner" TVs. (Rakvic-Farr Ex. 1006, Gulley Dep. 181:8-182:4.) Plaintiff admits that she was initially given a loaner TV at WSPF, and admits that Landers did not "lie" to her. Nor does plaintiff allege that Landers had a reason to believe that placement at WSPF would cause plaintiff harm. Plaintiff is dissatisfied with her placement at WSPF because WSPF has more limited movement that other, larger, institutions and "everywhere you go, you gotta have a [corrections officer] with you." This is the entirety of plaintiff's claim against Landers. (Rakvic-Farr Ex. 1006, Gulley Dep. 182:20-23, 184:16-22.)

5. <u>Dr. Tracy Johnson</u>

Plaintiff claims that when she would write Dr. Johnson about "bigger" issues, such as starting certain programs at the prison that plaintiff thought would be beneficial, Dr. Johnson did not write back to her. This is the extent of plaintiff's claim against Johnson, who was not her primary care provider at any time during her incarceration. Even though Dr. Johnson was not plaintiff's primary care provider, she would see her at least twice a week and when plaintiff engaged her, Dr. Johnson's interactions with her were "appropriate." (Rakvic-Farr Ex. 1006, Gulley Dep. 177:10-178:5.)

6. <u>Morrison, Gardner, and Boughton</u>

Plaintiff's claims against the remaining three defendants stem from their positions on the prison's program review committee (PRC) and their alleged control over "inmate housing." At least yearly, inmates are given a program review which re-assesses their custody classification and treatment and programming needs, reviews institutional

adjustment, and determines whether inmates should continue their current placement or be transferred to a different institution. Classification decisions are made after the PRC reviews criminal offense history; attitude regarding the criminal offense(s); length of sentence and overall time served; institutional adjustment and behavior; and medical, clinical, and programming needs. A recommendation to move an inmate to another prison or to change the security classification (from maximum to medium, for example), must be unanimous, and the decision is also reviewed by the director of the Bureau of Classification of Movement.

Transfers to WSPF are unique to the extent that if an inmate is recommended for WSPF, a Mental Health Screen must be completed, and an inmate must be accepted by psychological staff for placement at WSPF. The PRC does not have access to medical and psychological records and instead relies on the Mental Health Screen completed by the medical and psychological staff. None of the named defendants made the recommendation that plaintiff be placed at WSPF.

Plaintiff claims that Morrison made repeated representations to her that if she remained "conduct report free" for a certain period of time, then she could be transferred out of WSPF. Plaintiff claims that she was, in fact, conduct report free for certain periods of time, though she was repeatedly denied a transfer by Morrison and other members of the committee. Plaintiff claims that Morrison continues to deny transfers without reason. She admits that at least one of Morrison's denials was based on plaintiff's poor conduct, including forgery. Morrison's report indicated that she did not feel comfortable transferring plaintiff as a result of this conduct, and plaintiff agrees that this was a reasonable decision.

Plaintiff alleges that Morrison and Gardner know that she is "short tempered" and "easily set off," yet plaintff does not understand why the two defendants have not signed off on a transfer. Gardner was a member of the PRC for plaintiff's program review hearings in 2011, 2012, 2013, 2014, and 2015.

In 2011, plaintiff had nineteen conduct reports and was denied a transfer. She was advised to "refrain from any further major tickets" in order to move from WSPF. Plaintiff requested to be placed at other institutions and stated she "just wants out of here." (Morrison Ex. 1003 at 8.) In 2012, plaintiff was focused on a transfer to Waupun. In 2014, she had four minor conduct reports and eight "majors" since her last PRC review. Although plaintiff requested to transfer to another maximum security institution, her request was denied so plaintiff could complete her segregation time due to her conduct reports.

Plaintiff's most recent PRC hearing was on October 26, 2017. During the hearing, the PRC Committee noted that plaintiff had received seven major conduct reports and six minor conduct reports within the last year, including, but not limited to, conduct reports for threats, disobeying orders, disrespect, disruptive conduct, and sexual conduct. The PRC decided to retain plaintiff at WSPF.

Due to plaintiff's conduct history and disruptive behavior towards other inmates, professional security staff feels WSPF is the safest institution for her. If plaintiff were moved to another maximum-security institution, she would have to be housed in a double cell with another inmate and would be part of a larger inmate population. These scenarios present a safety and security risk to plaintiff as well as other inmates and staff. Plaintiff is not being retained at WSPF for punitive reasons, but is being retained

due to her problematic pattern of disobeying orders and disruptive conduct.  WSPF placement provides plaintiff with a single cell and higher level of monitoring which can provide a higher level of security, allowing staff to intervene when situations arise between plaintiff and other inmates due to her inappropriate sexual comments and behavior.

With respect to plaintiff's claims against Warden Boughton, she admits that when she wrote to Boughton about complaints, Boughton responded.  Plaintiff agrees that it is reasonable for Boughton, as the warden, to rely on psychological staff who are working with her on a regular basis.

Plaintiff continues to be housed at WSPF due to her inability to control her behavior and inability to maintain her composure, which may make her eligible for transfer to another prison.  Plaintiff agrees that her inmate and staff relations still need work, and she needs to continue to work with Psychological Services to control psychological issues.  Plaintiff admits that she has continually manipulated the process to get what she wants.  She claims she does not believe that "WSPF is appropriate housing for myself" based on her understanding that there is more appropriate programming at other prisons and her belief that there are more transgender inmates at other prisons.

### C.    Analysis

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009)); *see also*

15

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104). "[A] claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Arnett,* 658 F.3d at 750 (citation omitted). "[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 104).

It is undisputed that plaintiff has not been diagnosed with gender identity disorder. Moreover, as explained below, the undisputed facts do not support a finding that defendants were deliberately indifferent to plaintiff's medical needs.

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Id.* A prison official cannot be found liable under the Eighth Amendment unless the official "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" *Arnett*, 658 F.3d at 759 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir.

1998)). Deliberate indifference does not, however, include medical malpractice; "the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (citation omitted).

At most, plaintiff's claim against Dawson and Landers amounts to a disagreement over plaintiff's transfer to WSPF. Dawson claims that plaintiff wanted to go to WSPF. In any event, Dawson had no input on the decision to transfer plaintiff there. Landers allegedly evaluated plaintiff for her placement at WSPF and promised her programs there including a loaner TV. However, plaintiff does not claim that Landers thought that housing plaintiff at WSPF would cause harm, and plaintiff admits that while she initially had a loaner TV at WSPF, it was taken from her because of her conduct.

Plaintiff claims that, once she was housed at WSPF, Johnson did not write her back about bigger issues such as starting certain programs that plaintiff thought would be beneficial. It is undisputed that Johnson was not plaintiff's primary care provider at WSPF. Nonetheless, plaintiff acknowledges that Johnson, who is a psychologist supervisor at WSPF, would see her at least twice a week and when plaintiff engaged her, Johnson's interactions were "appropriate." These facts do not support a finding that Johnson acted with deliberate indifference toward plaintiff.

Turning to plaintiff's claims against Morrison, Gardner, and Boughton, she alleges that their refusal to transfer her from WSPF violated her constitutional rights. Plaintiff wants to transfer to another maximum-security institution because she thinks that it would be easier to live as a transgender person in a different institution. Plaintiff

alleges that she has been subjected to harassment, battery, and sexual assault at WSPF.

The Eighth Amendment's prohibition on "cruel and unusual punishment" establishes the minimum standard for the treatment of prisoners by prison officials. To demonstrate that prison conditions violated the Eighth Amendment, a prisoner must provide facts that satisfy a test involving both an objective and subjective component. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). The objective analysis focuses on whether prison conditions "exceeded contemporary bounds of decency of a mature, civilized society." *Id.* The subjective component requires evidence that prison officials acted wantonly and with deliberate indifference to a risk of serious harm to the prisoner. *Id.* Prisoners do not have a constitutional right to be housed in a particular prison. *See DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992); *see also Meachum v. Fano*, 427 U.S. 215, 224 (1976) (Constitution does not guarantee placement in a particular prison).

It is undisputed that plaintiff has been kept at WSPF because professional security staff think it is the safest institution for her due to her conduct history and disruptive behavior towards other inmates. The parties differ on their interpretations of plaintiff's behavior. Plaintiff states that other inmates are disrespectful towards her first, and then she reacts in kind. However, plaintiff admits that she has been attention seeking for as long as she can remember and that she does things to get a negative reaction from those around her. It is undusted that plaintiff has an extensive conduct history, that she has moved cells within WSPF on average every other week, and that she is disruptive on every unit where she is housed.

Plaintiff is not being retained at WSPF for punitive reasons, but is being retained due to her problematic pattern of disobeying orders and disruptive conduct. WSPF placement provides plaintiff with a single cell and a higher level of monitoring which can provide a higher level of security allowing staff to intervene when situations arise between plaintiff and other inmates due to her inappropriate sexual comments and behavior. Plaintiff does not allege that any defendant was responsible for the harassment or assaults at WSPF.

The record does not support a finding that Morrison, Gardner, and Boughton acted with deliberate indifference in not transferring plaintiff from WSPF. Thus, I will grant defendants' motion for summary judgment as to plaintiff's Eighth Amendment claims against them.

Finally, in the absence of any surviving federal claims, I will relinquish supplemental jurisdiction over plaintiff's state law claim against Johnson. *See* 28 U.S.C. § 1367(c); *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).

## PLAINTIFF'S MOTIONS

### A.     Motion for Diagnostic Evaluation

On December 15, 2017, plaintiff filed a motion for a diagnostic evaluation by an outside, independent, trained and qualified licensed psychologist and psychiatrist at the Wisconsin Resource Center. Plaintiff states that she has post-traumatic stress disorder based on experiences she went through as a child. She requests that defendants refer her to be re-evaluated for PTSD, bipolar disorder, OCD, ADHD, and possibly psychopathy/psychotic disorder. Plaintiff states that this is the only way to "defer/deny" her allegations against defendants. However, while the court is sympathetic to plaintiff's

childhood experiences, these allegations are not relevant to plaintiff's lawsuit. I will deny her motion.

**B.     Motion to Appoint Counsel**

On December 15, 2017, plaintiff filed a motion to appoint counsel. Plaintiff has filed other requests for counsel in the past, which I have denied. *See, e.g.,* ECF No. 108. Because I am dismissing this case, her most recent request for counsel will also be denied.

**C.     Motion for Injunctive Relief**

On January 4, 2018, plaintiff filed a motion for injunctive relief. She states that she is not safe at WSPF and that her safety, mental, and emotional health needs are not being adequately met there. According to plaintiff, defendants Gardner continues to house her near inmates who call her names like "snitch" and "punk ass bitch." Plaintiff states that she starts arguing with these inmates and then they smack her in the mouth while the officers are not watching. Plaintiff also states that defendants Gardner and Boughton have let Dr. Stacey Hoem, Officer Caliva, and other individuals write her retaliatory conduct reports. Plaintiff asks the court to grant her motion and issue an order for transfer to another institution where she will be able to get proper mental treatment.

Plaintiff has not met the standard for injunctive relief. As explained above, the plaintiff has not shown that the defendants are violating her constitutional rights by housing her at WSPF. Therefore, I will deny plaintiff's motion.

**D.     Motion for John Doe Criminal Investigation**

Plaintiff has filed a motion for a John Doe criminal investigation. She states that she brings the motion under Wis. Stat. § 968.26 based on the defendants' alleged violation of certain Wisconsin criminal statutes. However, I have no authority to commence a John Doe investigation under Wisconsin law. Therefore, this motion will be denied.

## ORDER

For the reasons stated, **IT IS ORDERED** that defendants' motion summary judgment (ECF No. 161) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for diagnostic evaluation (ECF No. 172) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to appoint counsel (ECF No. 173) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment (ECF No. 175) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for injunctive relief (ECF No. 179) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for John Doe criminal investigation (ECF No. 182) is **DENIED**.

**FINALLY, IT IS ORDERED** that the Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 25th day of May, 2018.

s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge